Filed 8/27/24  P. v. Jo CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SEYANG JO,<br><br>　　　Defendant and Appellant. | A168272<br><br>(Humboldt County<br>　Super. Ct. No. CR2200528) |

A jury found defendant Seyang Jo guilty of stalking in violation of Penal Code section 646.9, subdivision (a).  On appeal, Jo argues the trial court abused its discretion in denying his motion for mistrial after the complaining witness referenced "another victim" before the jury.  We affirm.

### BACKGROUND

The conduct giving rise to Jo's conviction occurred over five years between 2017 and 2022, with much of the communication occurring via email.

In July 2017, Jane Doe[1] posted an online advertisement looking for a room to rent in Portland, Oregon; Jo responded.  The two met at a coffee shop and talked for a few hours.  Jo seemed "normal," so Doe visited the

---

[1] We refer to the complaining witness as Jane Doe to protect her privacy.  (Cal. Rules of Court, rule 8.90(b)(4).)

1

apartment. Shortly thereafter, Doe and her kitten moved into Jo's apartment.

After a few weeks of living together, Jo began giving Doe "more attention than [she] necessarily wanted," hanging around Doe and staring at her "in uncomfortable ways." When confronted, Jo admitted that he wanted to "date" Doe, and Doe explained that she was not interested.

At one point, Doe brought a date back to the apartment. Jo "made it clear that he was very upset" and that Doe had "hurt his feelings." Jo continued to "try to convince [Doe] to go on a date," and Doe continued to object: "I made it very clear that I wasn't interested and that he should drop the subject."

Jo repeatedly sent messages to Doe asking where she was and that she "should go on a date with him"; Doe kept "telling him that [she] thought it was very inappropriate that he kept pushing it and he wasn't listening to [her]," but Jo responded in a joking manner, "you can't say no." The texts became "weirder" and "more disturbing." For example, Jo texted that "he wanted to trap [Doe] like a cat and pet [her]." Doe began "feeling very uncomfortable" and "did not feel safe being in the same apartment" as Jo, so she started spending the nights elsewhere—"couch surfing," staying with her ex-boyfriend, and staying in a hotel.

Doe eventually brought her ex-boyfriend to the apartment to "try to convince [Jo] that [dating] wasn't going to happen," which "agitated" and angered Jo. Doe decided that she could not continue living with Jo and planned to move.

In December 2017, Doe moved to her parent's home in Humbolt County, California. After leaving Portland, Doe sent a "pretty nasty" text

2

message to Jo saying that she "never wanted to speak to him again" and "I hope you die." Doe then blocked Jo on her cell phone.

But Jo continued to contact Doe by email, and "anonymous packages" started "showing up" at Doe's parent's house. In June of 2018, Jo sent an email stating that he was going to visit Doe in Humboldt County. In response, Doe wrote: "If you come, I am calling the police. Do not visit me. I am being 100% serious. You will have charges pressed against your harassment and stalking behavior." Jo agreed not to visit and apologized for making Doe "uncomfortable."

Doe then sought a restraining order against Jo, which was issued in July 2018 for a period of three years. Jo did not contact Doe while the restraining order was in effect, but he resumed emailing and attempting to visit Doe once the restraining order expired in August 2021.

In August 2021, Jo emailed Doe roughly every other day.[2] The emails included sexual references and suggestions of kidnapping. For example, in one email, Jo wrote, "I'd like [to] do it with you" and attached a picture of a seesaw. In another email, Jo joked, "What's [a] kidnapper's favorite shoes? White vans."

"Since he was joking about kidnapping" and Doe "felt that this was escalating and it was frightening to me," Doe decided to send a clear response. On August 27, 2021, Doe emailed Jo: "You, Seyang Jo, need to stop messaging me. As I have said before, once again, I need you to stop all communication with me. I do not consent to you emailing me. I do not consent to you calling me. I do not consent to you contacting me in any way ever again in any manner. Do not come near me or my family. [¶] You are

---

[2] Jo sent emails to Doe on August 5, 6, 8, 12, 13 (two emails), 14, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, and 27.

harassing me like you have done before and I will be filing another restraining order against you for stalking me and disrupting my life. Leave me alone."

Jo's communications temporarily stopped, but Jo started emailing Doe again in October 2021, asking: "You wouldn't allow me to communicate with you, would you?"

On November 4, 2021, at 1:57 a.m., Jo emailed Doe about buying a new car and explained he had "originally considered buying a white van to kidnap someone, but I did not buy that kind of car because kidnapping is maybe illegal? (Above is joke.)" Jo said he bought a school bus to give Doe "a ride to a school instead of kidnapping you." Jo also sent emails to Doe on November 13, 17, 22, 25, and 28, and on December 4 and 15. Doe did not respond because Doe "knew that no matter what [she] said, he wouldn't stop."

On December 24, 2021, Jo sent an email that "visibly distressed" Doe: "I want to sniff you. . . . I will touch your whole body. I will lick and suck your vagina. You will do for me too. I will shove my penis into your pussy. I want to call you my princess and queen, but now I will call you a whore or a bitch." On December 31, 2021, Jo sent an email with the subject line "Happy new 2022," and asked Doe: "What is the best plan to abduct you?"

In January 2022, Jo continued emailing Doe with pictures, emojis, and comments such as, "Please recognize my delusional true love that will last forever" and "I am a prisoner enclosed in you." The emails continued in February 2022, and included reference to delivering chocolates to Doe's home in Humboldt County and visiting Doe on February 22, 2022, "Twosday." On Valentine's Day, Jo emailed, "I feel like it is time to see you. . . . When and where would you like to meet?" A February 20 email bore the subject line, "I am coming," which prompted Doe to contact the police.

4

On February 22, 2022, Doe's mother was home alone, but Doe had warned her that Jo might come to the house. Doe's mother was alerted by their barking dogs, so she went to a second-story window and saw Jo park his car in front of their house. She called 911. Doe's mother watched Jo walk toward the front door and "heard the screen door open and then . . . heard a rattling of the door itself" before hearing the screen door close. Approximately 10 minutes later, Jo returned to the front door, and Doe's mother heard the rattling sound again. Jo attached a bottle of wine to the door handle and left.

Police officers arrived about an hour later and located Jo in a parking lot less than 0.3 miles from Doe's house. After contacting Doe, the officers arrested Jo.

At the time of Jo's arrest, officers observed a drone sitting on top of Jo's car; they subsequently found approximately 120 photographs of Doe, including nude photographs, on Jo's cell phone. Doe had not given Jo the nude pictures and suspects that they were stolen from one of her devices. Jo's cell phone also contained video footage of Doe's house and pictures of white cargo vans from online advertisements.

A jury trial took place between May 1 and May 5, 2023. Doe testified over the course of two days. On the second day, the prosecution asked Doe if there was "anything else significant" that Doe "perceived as harassment or stalking behavior." In response, Doe asked: "I'm wondering if I can talk about the sheriff's speaking to another victim?" The court promptly struck the testimony without objection from defense counsel. Jo immediately made an oral motion for mistrial, which the court denied after conducting a hearing outside the jury's presence. Before deliberations, the court instructed the jurors per CALCRIM No. 104: "If I ordered testimony stricken from the

5

record, you must disregard it and must not consider that testimony for any purpose."

After deliberating for approximately six hours, the jury returned a guilty verdict on the sole charge of stalking as a felony.

Jo again moved for a mistrial based on Doe's "another victim" question, which the court denied. At sentencing, the court gave Jo credit for the time he had served in custody, imposed but suspended execution of a two-year state prison sentence, and ordered three years of supervised probation, which included a condition that Jo not contact Doe.

Jo timely appealed.

## DISCUSSION

"We review a ruling on a motion for mistrial under the deferential abuse-of-discretion standard." (*People v. Williams* (1997) 16 Cal.4th 153, 210, citing *People v. McLain* (1988) 46 Cal.3d 97, 113; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 985–986 ["A motion for mistrial is directed to the sound discretion of the trial court"].) Trial courts should grant a motion for mistrial only where an error results in prejudice that cannot be cured through admonition or instruction. (*People v. Wharton* (1991) 53 Cal.3d 522, 565; see also *People v. Valdez* (2004) 32 Cal.4th 73, 128 ["Such a motion should only be granted when a defendant's 'chances of receiving a fair trial have been irreparably damaged' "].) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*Wharton*, at p. 565, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Similarly, we review for abuse of discretion "a trial court's reliance on a curative instruction in place of declaring a mistrial." (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 (*Navarrete*); see also *People v. Harris* (1994)

6

22 Cal.App.4th 1575, 1581 ["Whether in a given case the erroneous admission of [improper] evidence warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court"].) "Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*Navarrete*, at p. 834, citing *People v. Allen* (1978) 77 Cal.App.3d 924, 934–935; see also *People v. Burgener* (2003) 29 Cal.4th 833, 874 ["In the absence of evidence to the contrary, we presume the jury heeded the admonition"].)

Jo argues that Doe's "another victim" question improperly referenced excluded "other crimes" evidence and was inherently prejudicial. According to Jo, the court's instruction was not sufficient to cure the harm caused, and thus the court should have declared a mistrial. More specifically, Jo characterizes Doe's statement as "so substantial and devastating to Mr. Jo's defense that no admonition or instruction could have cured the error. . . ." We disagree.

In making these arguments, Jo relies primarily on *Navarrete* and *People v. Bentley* (1955) 131 Cal.App.2d 687 (*Bentley*), disapproved on other grounds in *People v. White* (1958) 50 Cal.2d 428, 431. We find both cases distinguishable, and neither requires reversal of Jo's conviction.

*Navarrete* concerned charges of committing a lewd act upon a minor. (*Navarrete, supra*, 181 Cal.App.4th at p. 829.) At trial, the prosecution asked a detective why he did not test for DNA. (*Id.* at p. 831.) The detective responded that he could not " 'state the first reason' " because of the court's ruling " 'that the defendant's statement is inadmissible' "—a reference to the court's exclusion of the defendant's pre-*Miranda* statement. (*Navarrete*, at

7

p. 829.)  The court promptly struck the testimony and excused the detective from testifying further.  (*Ibid.*)  The court denied the defendant's motion for mistrial, instead instructing the jury to disregard the detective's testimony.  (*Id.* at pp. 831–832.)  The jury ultimately convicted the defendant as charged.  (*Id.* at p. 833.)

The Court of Appeal reversed the conviction and remanded for retrial, explaining that "the court's curative instruction could not undo the damage . . . inflicted because the instruction did not break the link the jury was likely to perceive between a 'statement' and a 'confession' in the context of other evidence the jury heard."  (*Navarrete*, *supra*, 181 Cal.App.4th at pp. 833–834.)  Because the detective's statement implied that the defendant may have confessed, it "eviscerate[d]" any presumption of innocence.  (*Id.* at pp. 834, 836.)

Here, in contrast, Doe, a civilian untrained in the legal profession, asked if she was allowed to talk about "another victim" in response to the district attorney's question whether she remembered "anything else significant" in terms of "what you perceived as harassment or stalking behavior that we haven't talked about so far."  This vague reference, responsively uttered without context or any related trial testimony, does not automatically suggest an arrest, conviction, or confession for another offense. The term "victim" is commonly used in a variety of circumstances, and our Supreme Court has repeatedly affirmed denial of mistrial motions involving similar terminology suggestive of other acts conduct or incarceration.  (See, e.g., *People v. Perez* (2018) 4 Cal.5th 421, 459–460 [affirming denial of mistrial motion based on "a brief comment" that defendant " 'just got out of the penitentiary' "]; *People v. Collins* (2010) 49 Cal.4th 175, 196–199 [finding testimony that defendant made phone calls from prison were "brief and

8

ambiguous" and "any prejudicial effect could b[e] cured by an admonition"]; *People v. Valdez*, *supra*, 32 Cal.4th at p. 128 [affirming denial of mistrial motion "[b]ecause there was no misconduct on the part of the prosecutor and the reference to 'Chino Institute' was brief and isolated"]; *People v. Bolden* (2002) 29 Cal.4th 515, 555 [finding no abuse of discretion in denying mistral based on "fleeting reference to a parole office"].) In this instance, Doe's vague question about "another victim" "is not one of those exceptional cases in which the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions." (*People v. Seiterle* (1963) 59 Cal.2d 703, 710.)

*Bentley* is similarly distinguishable. Like *Navarrete*, *Bentley* concerned the denial of a motion for mistrial after a jury trial conviction for lewd acts upon a minor. (*Bentley*, *supra*, 131 Cal.App.2d at p. 688.) At trial, a police officer testified that he questioned the defendant "about activities he had been involved in in 1942 when he had been a suspect in another case . . . ." (*Id.* at p. 689.) The statement was stricken, and the jury admonished to disregard it. (*Ibid.*)

Defense counsel went on to call five character witnesses. (*Bentley*, *supra*, 131 Cal.App.2d at p. 689.) On cross-examination, each character witness was questioned about defendant's prior charges and "a girl named Tomlinson" who had reported " 'the same type of offense' as that for which [Bentley] was on trial." (*Ibid.*) Bentley then testified on his own behalf and denied any knowledge of Tomlinson when asked by his counsel. (*Ibid.*) In rebuttal, the district attorney called Tomlinson and her mother as witnesses, which spurred defense objections, a motion to strike that was not ruled upon, and further "interrogation" by the court. (*Id.* at pp. 689–690.) Ultimately, the Court of Appeal agreed with defendant that the "deliberate" statement of

9

the police officer was made with "the idea in mind of prejudicing defendant," and the court's failure to rule on the motion to strike required reversal. (*Id.* at p. 690.) The Court of Appeal further found that although the district attorney's questioning of the character witnesses "was proper," the purpose of the questioning was unclear, and the trial court should have given the jury explanatory instructions on its own motion. (*Id.* at p. 691.)

The circumstances here are vastly different. Doe uttered the word "victim" when asking for guidance in response to the district attorney's broader question; no context or specifics were offered, no additional questions were asked, nor were any related witnesses called. Further distinguishing *Bentley*, the court immediately struck Doe's testimony and provided curative instructions before deliberations.[3]

Moreover, Doe's question demonstrates the absence of intentionality that characterized both *Navarrete* and *Bentley*. At the ensuing hearing outside the presence of the jury, the district attorney explained that it was unaware that Doe knew about "the allegations that are related to this other person," thus there had been no related motion in limine or admonishment to exclude other acts testimony. Ultimately, as the trial court stated, the jury was presented with "a lot of evidence," and Doe's statement was not "all that more prejudicial than the evidence the jury already has in front of it."

That evidence before the jury is perhaps the most significant contrast with *Navarrete* and *Bentley*. As the trial court repeated, "[t]his is not a case where there is no evidence." Jo and Doe lived together for less than six months in 2017, yet Jo continued to contact Doe—despite her repeated and

---

[3] The court offered to provide curative instructions immediately after Doe's question, which defense counsel declined so as to not "call any more attention" to the statement.

unequivocal objections—for nearly five years. Jo's conduct led to the issuance of a three-year restraining order and, after the expiration of the restraining order, Jo's communications and attempts to visit Doe *increased* and included threats of kidnapping and sexual assault. In the end, even after being warned Doe would call the police, Jo crossed state lines to visit Doe. Considering the overwhelming evidence, it is not reasonably probable that a jury would have reached a more favorable conclusion absent Doe's question.

Jo further argues prejudice in that Doe's testimony about "another victim" undermined their intent-based trial defense. While acknowledging Jo's behavior was "bizarre," Jo's trial counsel had argued Jo lacked the requisite intent or mental state for a stalking conviction because his conduct was merely an attempt to secure Doe's "affection" and "attention." But now, rather than viewing Jo as "a socially awkward introvert who had badly misjudged the impact of his behavior," defense counsel argues that the jury instead saw Jo as "a serial stalker, who regularly stalked women in a similar manner."

But the record belies these arguments. As narrated above, there was substantial and uncontroverted evidence that Doe unambiguously rebuffed Jo at every turn and that Jo understood the wrongfulness of his conduct. For example, in June 2018, Jo acknowledged via email that Doe "clearly" showed she did not want Jo to visit her and apologized for making Doe "feel uncomfortable." Doe then obtained a restraining order that Jo complied with, demonstrating an understanding of the nature and scope of the order. However, after the expiration of that restraining order, Jo not only returned to joking about kidnapping Doe but escalated his rhetoric with discussions of sexual assault. Against this record, Jo's attempt to portray himself as a someone who "badly misjudged the impact [of] his behavior" is unpersuasive;

11

Doe's reference to "another victim" is inconsequential considering the virtually uncontradicted evidence the jury had before it.

Last, Jo argues that denial of the mistrial motion violated his "federal constitutional rights," and thus the People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," as set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. In the alternative, Jo argues reversal is required under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Assuming, arguendo, the court's denial of Jo's mistrial motion was error, it was harmless under both standards.

Jo makes a passing reference to violations of the Fifth and Fourteenth Amendments to the United States Constitution, but " '[m]ere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review.' " (*People v. Shah* (2023) 96 Cal.App.5th 879, 894, fn. 5.) Jo does not criticize the trial court's sua sponte striking of Doe's "another victim" statement. Nor does Jo dispute that the court accurately instructed the jury, including in providing CALCRIM No. 104, regarding stricken testimony, and CALCRIM No. 3406, as modified, regarding mistake of fact, which was central to Jo's defense. And in any event, "the application of ordinary rules of evidence does not implicate the federal Constitution." (*People v. Harris* (2005) 37 Cal.4th 310, 336; see also *People v. Lynch* (Aug. 1, 2024, S274942) 2024 WL 3613805, p. *8 ["We apply the *Watson* test to errors of state law that do not rise to the level of federal constitutional error"].)

Instead, Jo repeats his argument of prejudice because Doe's reference to "another victim" "undercut the defense theory that [Jo] did not understand the impact of his actions." But as discussed above, the overwhelming

12

evidence presented of Jo's "willful" and "intentional" conduct demonstrates beyond a reasonable doubt that the jury would have reached the same verdict without Doe's "another victim" utterance. (CALCRIM No. 1301; *People v. Chapman, supra,* 386 U.S. at p. 24.)

Thus, we turn to Jo's alternative argument that a *Watson* analysis requires reversal because the "over six hours" of jury deliberations demonstrates that "the jury struggled with its verdict." According to Jo, it is "reasonably probable" that Jo would have obtained a more favorable outcome in the absence of the error. Again, we disagree.

The length of jury deliberations is not a reliable indicator of "closeness." (See *People v. Avena* (1996) 13 Cal.4th 394, 436 [rejecting "defendant's assumption the length of penalty deliberations in this case indicates the jury had 'difficulty' with the penalty decision"]; *In re Sassounian* (1995) 9 Cal.4th 535, 548, fn. 10 ["the fact that the jury devoted a great amount of time to deliberations . . . does not entail a conclusion that . . . the case was close as to first degree murder"].)

That said, approximately six hours of deliberations after a week-long trial is not long, particularly for a charge of this nature. (*Cf. People v. Walker* (1995) 31 Cal.App.4th 432, 438 [finding six and a half hours of deliberations after two and a half hours of evidence was not indicative of closeness and affirming conviction of first degree residential robbery and burglary].) Here, the jury heard testimony from five witnesses, including two days of testimony from Doe, and received over 90 exhibits, including almost 100 pages of email communications transmitted over the course of five years. In their deliberations, the jury did not pose any questions to the court, nor did the jury ever report any level of uncertainty or an inability to reach a verdict. We

13

therefore reject the notion that the length of deliberations suggests a "closeness" that demonstrates prejudicial error.

Additionally, as discussed above, the weight and volume of evidence overwhelmingly supports the jury's verdict. Consequently, any error in this case was harmless since it is not reasonably probable that a result more favorable to Jo would have been reached in the absence of Doe's question. (*Watson, supra*, 46 Cal.2d at p. 837.)

## DISPOSITION

We conclude that the trial court did not err in denying Jo's motion for mistrial. Accordingly, the judgment is affirmed.

_____

DESAUTELS, J.

We concur:

_____

STEWART, P.J.

_____

MILLER, J.

*People v. Jo* (A168272)

15